1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

10

EASTERN DISTRICT OF CALIFORNIA

11

ARTURO RENEE ROMERO,                    1:10-CV-01190 AWI GSA HC

12

               Petitioner,          FINDINGS AND RECOMMENDATION

13

                               REGARDING PETITION FOR WRIT OF
           v.                             HABEAS CORPUS

14
15

JAMES A. YATES, Warden,

16

               Respondent.

17

_____/

18

       Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant

19

to 28 U.S.C. § 2254.  He is represented in this action by Charles Carbone, Esq.

20

**BACKGROUND**[1]

21

       Petitioner is currently in the custody of the California Department of Corrections pursuant

22

to a judgment of the Superior Court of California, County of Kern, following his conviction by

23

jury trial on March 16, 2007, of corporal injury to a cohabitant (Cal. Penal Code § 273.5(1)[2]);

24

torture (§ 206); rape by force or fear (§ 261(a)(2)); oral copulation by force or fear (§ 288a(c)(2));

25

making threats with intent to terrorize (§ 422); and dissuading a victim from reporting a crime

26

---

27

    [1]This information is derived from the pleadings in this case and the state court records lodged by
Respondent with his response.

28

    [2]All further statutory references are to the California Penal Code unless otherwise noted.

1    (§ 136.1(b)(1)).  The jury found true the allegations that Petitioner had personally inflicted great

2    bodily injury in the commission of corporal injury (§ 12022.7(e)).  In a bifurcated proceeding, the

3    trial court found true the allegation that Petitioner had served a prior prison term (§ 667.5(b)).

4    He was sentenced to serve an indeterminate term of life with the possibility of parole plus twelve

5    years and four months.

6         Petitioner filed a timely notice of appeal.  On February 18, 2009, the California Court of

7    Appeal, Fifth Appellate District ("Fifth DCA"), affirmed Petitioner's judgment in a reasoned

8    decision.  Petitioner then filed a petition for review in the California Supreme Court.  The

9    petition was summarily denied on May 13, 2009.

10        On June 30, 2010, Petitioner filed the instant federal habeas petition.  He claims the trial

11   court violated his constitutional rights under the Sixth and Fourteenth Amendments when it

12   refused to re-appoint him a lawyer at trial.  Respondent filed an answer to the petition on

13   September 16, 2010.  On October 17, 2010, Petitioner filed a traverse.

## STATEMENT OF FACTS[3]

15        On January 13, 2005, [Petitioner] lived with his girlfriend Ruth and her eight-
     month-old son. Around 10:00 p.m., after she had put her son to bed, Ruth went upstairs to
16   lie down. She was still wearing her street clothes, including a belt with a large, heavy,
     metal buckle. [Petitioner] was downstairs smoking crystal methamphetamine.

17

18        Later, [Petitioner] came into the bedroom and accused Ruth of talking to his
     friends behind his back. Ruth insisted she had not done so, but [Petitioner] was convinced
19   that Ruth was telling his friends he had a small penis. Ruth was not able to calm
     [Petitioner] down and, because she was afraid of him, began to back out of the room.
20   [Petitioner] grabbed her face and pushed her onto the bed. Ruth tried to get up, but
     [Petitioner] pushed her back down.

21        [Petitioner] ripped off Ruth's sweater and belt and beat her with the buckle. When
     the buckle fell off the belt, [Petitioner] began to punch Ruth in the face and tried to
22   suffocate her by pushing her face into the bed. He turned up the volume on a radio to
     drown out Ruth's screams as he continued to punch her in the head.

23

24        [Petitioner] then kneed Ruth in the face, which caused her nose to bleed and
     knocked her unconscious. When Ruth awoke, she was lying on the floor and [Petitioner]
25   was kicking her in the stomach. At some point, [Petitioner] placed one hand around
     Ruth's neck and used the other to poke his fingers into her eyes.

26        [Petitioner] told Ruth he would kill her if she tried to leave the room or told

27

28        [3]The Fifth DCA's summary of the facts in its February 18, 2009, opinion is presumed correct. 28 U.S.C.
     §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the Fifth DCA.

anyone what had happened. [Petitioner] grabbed another belt and beat Ruth with the buckle as he continued to accuse her of talking to his friends behind his back. Eventually, Ruth admitted she had done so even though it was not true.

[Petitioner] became angrier and continued to beat Ruth until her vision blurred and she threw up. [Petitioner] continued to kick Ruth in the stomach. [Petitioner] then threw up and blew "snot" on Ruth. He eventually stopped and left the room when Ruth heard a man's voice downstairs.

Ruth passed out in the bathroom, and [Petitioner] carried her to bed and changed her clothes.

Ruth woke the next morning, January 14, and called out for help. She was still throwing up. [Petitioner] changed her shirt and told her he was sorry and loved her. She dozed off again. When she awoke, [Petitioner] changed her son's diaper and then left Ruth and the baby for the rest of the day.

Ruth stayed in bed the entire day because she was so sore. Sometime during the day, [Petitioner] brought her a sandwich, saying she needed to eat, but she was not able to. That evening, after the baby was asleep, [Petitioner] helped Ruth down the stairs because he said she needed to eat. While they were in the kitchen, someone knocked on the door. [Petitioner] went upstairs to get his gun and told Ruth to open the door, but her hands were too badly bruised. [Petitioner] then opened the door and two individuals came in and went upstairs with [Petitioner]. It was dark in the living room and kitchen and neither individual looked at Ruth. Ruth did not try to leave the apartment because she did not have a key for the locked door and her son was upstairs. Eventually, the two individuals left.

[Petitioner] went back upstairs and Ruth slowly followed. She lay down on the bed next to [Petitioner], who began poking her and again accusing her of talking behind his back. Although Ruth complained she was in pain, [Petitioner] laughed and continued to poke her. [Petitioner] grabbed a red indelible marking pen and drew pictures on her cheek. He then used his cell phone to take pictures of the drawings. [Petitioner] showed her the pictures and threatened to beat her up again. Eventually Ruth fell asleep.

When Ruth woke the next morning, January 15, 2005, [Petitioner] told her to get up and do the laundry. Ruth's son crawled into the room, and Ruth fed him before he crawled out again. [Petitioner] then told Ruth he wanted to have sex. Although Ruth protested that she was in pain, [Petitioner] threatened to hurt her again if she did not comply.

[Petitioner] pulled off his pants and began to masturbate. He ordered Ruth to do the same. He forced Ruth to orally copulate him and have sexual intercourse. He then left the room.

When [Petitioner] returned, Ruth was curled up crying, but [Petitioner] told her to "get over it" and do the laundry. Ruth slowly got up and went into her son's room, where she contemplated how to leave the apartment. She grabbed some clothes to make it look like she was going to do the laundry and hid her son's diaper bag under the clothes. She went downstairs and put the clothes and diaper bag under the stairs. [Petitioner] was still upstairs lying down at the time.

Ruth tried the door, but it was locked and she didn't have a key. When [Petitioner] asked what she was doing, Ruth replied that she was in need of quarters to do laundry. [Petitioner] told her there were quarters by the microwave. Ruth remembered that the

back door might be unlocked and, when [Petitioner] eventually fell asleep, Ruth took her son and the diaper bag and ran as fast as she could.

Ruth made it to the house of her relatives, Mr. and Mrs. Ruiz, where she told Mr. Ruiz that [Petitioner] had assaulted her. Mr. Ruiz noticed bruises all over Ruth's arms and blood smeared on her face. Mrs. Ruiz took Ruth into the bathroom where she was able to see that her entire body was covered with bruises and red marks on her arms.

Ruth begged the Ruizes not to call the police because [Petitioner] had threatened to kill her if she told anyone what had happened. The Ruizes took Ruth and her son to the apartment of her aunts. Ruth appeared to be in constant pain and needed help getting in and out of the car.

Despite Ruth's protests not to call the police, her aunts did. Firefighters arrived and found Ruth on the couch crying. She had bruises on her head, neck, and arms, and a cervical collar was placed around her neck as a precaution. Veteran firefighter, Captain Steve Woodward, had never seen such extensive bruising on a live patient.

An ambulance arrived and took Ruth to the hospital. Paramedic Ryan Beck noticed a number of visible bruises on Ruth's body and vaginal bleeding was visible through her clothing. En route to the hospital, Ruth was in pain, seemed anxious, and repeatedly asked if someone was following them.

Dr. David Obert treated Ruth when she arrived at the hospital. He noticed multiple abrasions, contusions, discoloration, and bruising over nearly all of her body. Dr. Obert examined her for internal injuries. Ruth complained of neck, back, and chest pain. Ruth's right eye was swollen and her nose fractured. The bruises on Ruth's body were in various stages of healing-some as little as 12 hours old and others several days old-and were consistent with Ruth's explanation of how she received them.

Police arrived and Ruth told Officer Ted Martinez that she was afraid of the person who caused the injuries.

A sexual assault examination was performed on Ruth. She told the nurse who performed the exam that she had been beaten multiple times over three days and was sexually assaulted during that period. Ruth's injuries, including a recent laceration on her vaginal wall that was oozing blood, were consistent with injuries that could have been caused by a sexual assault.

Officers went to [Petitioner]'s apartment and attempted to coax him outside. [Petitioner] appeared at a window with a cordless phone. He said he wanted the officers to explain to the person on the phone what was going on. He also said he needed to retrieve the key to unlock the front door. Eventually, he unlocked the door and was arrested.

Officers returned to the apartment with a search warrant and found, inter alia, a red marking pen, cell phones, a sword, a survival knife, and belts. The officers also found red ink on a pillow, dried blood and smeared red ink on a white comforter, a pair of women's blood-stained jeans, and a belt that was torn where the buckle had been attached but was missing.

While in jail, [Petitioner] spoke on the phone with an ex-girlfriend, Erica L., and told her he had "fucked [Ruth] up" because "[s]he was pushing my buttons too fuckin' much." The call had been recorded and replayed for the jury.

Photographs recovered from [Petitioner]'s cell phone included one on January 13, 2005, at 10:59 p.m., showing Ruth sitting on the stairs of the apartment with a bloody nose, and two others, taken January 15, 2005, at 6:58 and 7:04 a.m., showing what looks like an erect penis and scrotum drawn in red ink on the right side of Ruth's face.

Angela C. testified that she was [Petitioner]'s girlfriend in 1999, and that during their relationship, he had accused her of giving him "crabs." When the two walked to the store to buy some cream to treat the "crabs," [Petitioner] pushed and punched Ms. C., pulled her hair, and called her a whore and a slut. Ms. C. tried to run away, but [Petitioner] caught up with and tackled her. She fell to the ground and heard her collarbone snap. [Petitioner] covered her mouth when she screamed. He told Ms. C. not to tell anyone what had happened. When questioned by officers, she said that her injury had occurred while she and [Petitioner] were playing around. At the hospital, Ms. C. told the doctor she tripped and fell while walking with [Petitioner], but the doctor thought that an unlikely explanation.

After [Petitioner] apologized to her, Ms. C. resumed her relationship with him. Sometime later, [Petitioner] choked Ms. C. until she blacked out. When she woke, [Petitioner] told her she could not leave until she kissed his shoe. He proceeded to grab her, rip her pants, throw her out the door, kick her, and spit on her. On another occasion, [Petitioner] got drunk, choked Ms. C., and kneed her in the stomach, although both thought she was pregnant at the time. Their relationship ended in 2000.

During Ms. C.'s relationship with [Petitioner], her mother noticed bruises all over Ms. C.'s body. At one point, she noticed Ms. C. was missing a patch of hair from the back of her head. Ms. C. made various excuses for her injuries and alienated herself from her family.

Erica L. began a relationship with [Petitioner] in October of 2004. One day, [Petitioner] grabbed the tie of her work uniform and threw her down the stairs, resulting in a huge bruise on her hip. When her mother asked about the injury, Ms. L. said she had hit the corner of a table at work. Ms. L. was afraid to leave the relationship because [Petitioner] would physically prevent her from leaving. He kept the doors of the apartment locked and did not give her a key. He also kept a baseball bat by the door. On one occasion, despite her refusal, [Petitioner] forced Ms. L. to have sexual intercourse with him.

[Petitioner] testified in his own behalf. According to [Petitioner], Ruth arrived at the apartment on the night of January 13, 2005, holding her son in his car seat. She was beat up and smelled like alcohol. They went upstairs and Ruth began vomiting. Ruth insisted that she was fine, so [Petitioner] took a picture of her bloody nose to show her what she looked like. [Petitioner] cleaned Ruth up with water and gave her a change of clothes. [Petitioner] and Ruth then went to bed.

The following day, [Petitioner] thought Ruth seemed normal, although she did have some bruising on her fingers and a black eyelid. [Petitioner] claimed Ruth changed the comforter on the bed, replacing it with one she had brought the previous day when she moved some of her items into the apartment. In the evening, [Petitioner] and Ruth visited with two of their friends, Maureen Deanda and Mark Zavala.

After the friends left, [Petitioner] and Ruth had consensual sex, and she consensually orally copulated him. [Petitioner] acknowledged that he had taken methamphetamine earlier in the day, which changed his personality. After having sex, [Petitioner] took a shower and noticed an abnormal growth on his genital area, which he attributed to large lumps Ruth had earlier shown him in her vagina. [Petitioner] "freaked

out" about the possibility of contracting AIDS or a "fatal STD" from Ruth. He was angry because Ruth had hidden this problem from him for so long. He responded by drawing a penis on Ruth's cheek while she slept.

When Ruth woke up, [Petitioner] took pictures of the drawing to show her and to warn her to stop running around with other men. He claimed Ruth cussed at him and accused him of sleeping with two women friends. [Petitioner] attacked Ruth after she hit him in the face. He claimed to use his hands and feet to beat her, and did not remember using a belt. [Petitioner] did not recall how long the beating lasted, but he acknowledged that it was "severe" and that it caused the injuries shown in the prosecution's photographs.

[Petitioner] acknowledged that he never told the officer that Ruth had come to his apartment on January 13, 2005, drunk and with a bloody nose. He told the officer that he only hit Ruth six times and she was "playing victim."

[Petitioner] denied causing Ms. C.'s injuries, claiming instead that he fell on top of her, although he did not know that her collarbone was broken at the time. [Petitioner] admitted that the two of them had a physically abusive relationship.

[Petitioner] described his relationship with Ms. L. as verbally abusive, and he pushed her one time, causing a bruise on her hip.

A neighbor, Edward Perez, testified that he lived in the same apartment complex as [Petitioner]. The complex had three joined apartments; his was on one end and [Petitioner]'s was on the other. Perez did not hear any loud music or screams on January 13, 2005.

Maureen Deanda testified that she and a man named Mark Zavala visited the apartment on January 14, 2005. Deanda physically saw Ruth, who answered the front door, and she did not notice anything unusual about Ruth's appearance. Ruth went into the kitchen, and Deanda and Zavala went upstairs.

[Petitioner]'s mother, Marta Murphy, testified that she received a phone call from [Petitioner] on January 14, 2005, and she had a "normal conversation" with both [Petitioner] and Ruth. She called back later that day and spoke to both of them again. The next morning Murphy received a call from [Petitioner]. He was crying and told her Ruth had given him AIDS. Murphy testified she was on the phone with her son at the time of his arrest. She briefly spoke to an officer who said he would call her back.

In rebuttal, Detective Terry testified that he returned Murphy's phone call on January 16, 2005. At that time, Murphy admitted that [Petitioner] had told her he hit Ruth.

(See Resp't's Answer Ex. A.)

## DISCUSSION

I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody

pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

529 U.S. 362, 375, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of Kern County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008 (1997), *quoting,* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.     Standard of Review

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70 (2003).  Under the AEDPA, a petitioner can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412; see also Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 785 (2011). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the

1    Supreme Court at the time the state court renders its decision." Lockyer, 538 U.S. at 71.

2         Finally, this Court must consider whether the state court's decision was "contrary to, or

3    involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at

4    72, *quoting*, 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may

5    grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]

6    Court on a question of law or if the state court decides a case differently than [the] Court has on a

7    set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S.

8    at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the

9    state court identifies the correct governing legal principle from [the] Court's decisions but

10   unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

11        "[A] federal court may not issue the writ simply because the court concludes in its

12   independent judgment that the relevant state court decision applied clearly established federal

13   law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411;

14   see also Harrington, 131 S.Ct. at 785.  A federal habeas court making the "unreasonable

15   application" inquiry should ask whether the state court's application of clearly established federal

16   law was "objectively unreasonable." Williams, 529 U.S. at 409.  "A state court's determination

17   that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could

18   disagree' on the correctness of the state court's decision." Harrington, 131 S.Ct. at 786, *quoting*,

19   Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  Further, "it is not an unreasonable

20   application of clearly established Federal law for a state court to decline to apply a specific legal

21   rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556, U.S. __,

22   __, 129 S.Ct. 1411, 1413-14 (2009).  "Under 2254(d), a habeas court must determine what

23   arguments or theories supported or, . . . could have supported, the state court's decision; and then

24   it must ask whether it is possible fairminded jurists could disagree that those arguments or

25   theories are inconsistent with the holding of a prior decision of [the Supreme] Court." 

26   Harrington, 131 S.Ct. at 786.  Only "where there is no possibility fairminded jurists could

27   disagree that the state court's decision conflicts with [the Supreme] Court's precedents" may the

28   writ issue. Id.

8

1    Petitioner has the burden of establishing that the decision of the state court is contrary to

2 or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

3 Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

4 states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

5 state court decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-

6 01 (9th Cir.1999).

7    AEDPA requires that we give considerable deference to state court decisions. "Factual

8 determinations by state courts are presumed correct absent clear and convincing evidence to the

9 contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a

10 factual determination will not be overturned on factual grounds unless objectively unreasonable

11 in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v.

12 Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to

13 findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett,

14 393 F.3d 943, 976-77 (2004).

15 III.    Review of Claims

16    Petitioner contends the trial court violated his constitutional rights by denying his request

17 to withdraw his waiver of counsel midway through trial and appoint counsel on his behalf.  This

18 claim was presented on direct appeal to the Fifth DCA where it was rejected in a reasoned

19 decision.  Petitioner then presented the claim in a petition for review to the California Supreme

20 Court where it was summarily rejected.  When the California Supreme Court's opinion is

21 summary in nature, the Court must "look through" that decision to the court below that has

22 issued a reasoned opinion.  Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991).  In this

23 case, the appellate decision was the last reasoned decision.  The appellate court denied the claim

24 as follows:

25          [Petitioner]'s only contention on appeal is that the trial court prejudicially abused
          its discretion when it denied his request to withdraw his *Faretta* waiver and have an
26          attorney appointed to represent him at trial.

27          At the outset, we describe the pertinent proceedings; then we analyze the specific
          issue presented.

28

9

*Procedural History*

[Petitioner] was arrested on January 15, 2005. Eight different attorneys were appointed to represent him while he awaited trial, which commenced on November 13, 2006. On February 2, 2005, Judge Lee Phillip Felice granted [Petitioner]'s *Marsden*[FN3] motion, relieving Deputy Public Defender Bruce Fox, because Fox failed to communicate sufficiently with [Petitioner]. The court appointed Michael Gardina from the indigent defense program.

FN3. *People v. Marsden* (1970) 2 Cal.3d 118.

On September 28, 2005, Judge James Stuart granted Gardina's motion to withdraw as defense counsel because of an unspecified conflict of interest. The court appointed Frank Butkiewicz to replace him.

On December 1, 2005, Judge Stuart granted Butkiewicz's motion to withdraw as defense counsel because of an unspecified conflict of interest and appointed Charles Soria to represent [Petitioner].

On January 25, 2006, Judge Jerold Turner granted Soria's motion to withdraw as defense counsel because of an unspecified conflict of interest. The court appointed Gael Mueller to represent [Petitioner].

On March 13, 2006, Judge Jon Stuebbe granted Mueller's motion to withdraw as defense counsel because of an unspecified conflict of interest. The court appointed Douglas Moffat to represent [Petitioner].

On July 3, 2006, the court granted [Petitioner]'s *Marsden* motion to relieve Moffat. Moffat explained that there had been a breakdown in the relationship to the point that Moffat was no longer effectively representing [Petitioner]. The court appointed Roger Lampkin to represent [Petitioner].

On August 30, 2006, Judge Felice granted Lampkin's motion to withdraw as defense counsel because of an unspecified conflict of interest. It then appointed Richard Rivera to represent [Petitioner].

On October 31, 2006, the court held a hearing to consider attorney Rivera's motion to continue [Petitioner]'s trial date from November 13, 2006, to January 8, 2007. Rivera noted that he had just received 450 additional pages of discovery the previous day and was still waiting to receive CD's and transcripts of a conversation between [Petitioner] and a potential witness. Questioned by the trial court, however, Rivera acknowledged that [Petitioner] was not willing to waive time. [Petitioner] said:

"I do not have a problem waiving time. I just don't know why it's taken a year and a half since I've spoke to my investigator or two years to get my phone records. I mean, I don't know what I have to do to get a trial. I have my witnesses subpoenaed. I've been wanting to take this to trial for a long time now, and if representing myself is what I have to do, then that's what I'm going to do, as of now."

Rivera explained that his investigator was seeking to re-subpoena witnesses who had originally been identified in 2005. He also needed additional time to obtain an expert witness "to rebut their experts." In response, [Petitioner] stated that other defense attorneys had argued the same thing, but nothing had happened. He then said he had been in jail for a year and a half, was tired of it, and wanted a trial: "I'll represent myself from

now on."

After an hour's recess, [Petitioner] complained that he had a conflict with Rivera, because "what he says on the record and what he tells me as an attorney are night and day." The following exchange then occurred:

"The Court: Well, do you want to represent yourself, or do you not?

"[Petitioner]: Yes, yes.

"The Court: Okay. And I don't want to put words in your mouth. Are you sure that you're asking the Court to relieve Mr. Rivera and allow you to represent yourself?

"[Petitioner]: I believe that's the only way I'll get a trial; so, yes."

The court then cautioned [Petitioner] about the pitfalls of self-representation and the seriousness of [Petitioner]'s case. The court explained that [Petitioner] would have to comply with evidentiary and procedural rules, without help from the judge. [Petitioner] responded that he had "weighed out all the pros and cons," and the court continued with the *Faretta* voir dire.

At one point, [Petitioner] seemed to vacillate:

"[Petitioner]: The only thing, Your Honor, if it came upon to an agreement, I would accept counsel, but we're not so-

"The Court: I'm not in a position to get involved in forcing Mr. Rivera to agree to something other than what he feels he has to do in this case. [¶] Do you understand Mr. Rivera is making this motion to continue?

"[Petitioner]: I understand that.

"The Court: The Court is compelled to grant the motion because I can't force him to go to trial unless, you know-if he's not prepared, because if I were to do that, this case would come back rather quickly on appeal. Okay?

"[Petitioner]: Right.

"The Court: Because that's called pro per, and that's another aspect of representing yourself.

"[Petitioner]: I just don't understand why he's waiving time now. I have evidence-

"The Court: He's not waiving time. He's asking me to continue the case.

"[Petitioner]: Yes. I don't understand why he's requesting a continuance now.

"The Court: Because he hasn't been able to review all the discovery. He does not know what the People have. He was just given 450 pages of discovery, approximately, six days ago. His practice is such that he can't devote 24/7 to your case. He has other cases and so-and his investigator needs to locate and subpoena your witnesses.

"[Petitioner]: I don't know where he's at.

"The Court: Well, all I'm telling you is this-and this is a situation where, you know, you're going to be in, also. I mean, you're going to have an investigator. I assume that we'll get the investigator who is currently assigned. He'll continue to work with you. But you're not going to be in any different position than Mr. Rivera. You're going to have an investigator who has not been able to locate and serve witnesses....

"[Petitioner]: Right. But with time, witnesses dissolve, and it's been almost a year and a half since I've spoke to an investigator.

"The Court: Okay.

"[Petitioner]: And I want to get on with it.

"The Court: Okay. With or without witnesses?

"[Petitioner]: Oh, I'm going to-I'll speak with the investigator. I'll have to subpoena the witnesses.

"The Court: What happens if, as in Mr. Rivera's declaration, you don't have witnesses?

"[Petitioner]: I-

"The Court: That's what he's alleging. He has not been able to locate and subpoena the defense witnesses.

"[Petitioner]: I haven't even spoke to the investigator to give him the names of the witnesses or-

"The Court: ... I do not-all I'm saying is this: Is that you're going to be in no better position in terms of being prepared to go to trial on the date of this trial than Mr. Rivera. In fact, you're going to be in worse shape.

"[Petitioner]: Right.

"The Court: Okay. Do you understand that? [¶] Is that a 'yes'?

"[Petitioner]: Yes.

"The Court: In terms of the law library privilege or any other jail privilege, it's not going to change as a result of getting pro per status in this case. [¶] Do you understand that?

"[Petitioner]: Well, with all due respect-okay. All the D.A. and discovery and hundreds of pages of this and that, it doesn't change the fact that their star witness has no credibility, lacks veracity. I mean, Your Honor, I don't understand why it takes two years to have a trial. I'm just going crazy. I'm locked in a cell 20 hours a day. That's the only thing I have to dwell on, and I'm just ... I want to see some kind of progress, and with that I'd be satisfied. I don't have a problem waiving time.

"The Court: And I do understand your frustration. I know you're frustrated with this. I was hoping to get it to trial. I was even trying to force Mr. Rivera to go to trial. But I can't force him at this juncture, given what he's put in his declaration.

"[Petitioner]: I understand. That affidavit I submitted, I was pretty-I kind of laid it down what I wanted to have. And I don't know what happened with that.

"Mr. Rivera: He's referring to the motion that was litigating.

"The Court: Motion to dismiss?

"[Petitioner]: Among other things, I mean, I wanted to speak with the investigator immediately for copies of my cell phone records, all incoming and outgoing calls. I want to confirm for trial. I want to impeach the prosecution's witness. And if he-for some reason his schedule conflicted with that, then I wanted to request a *Marsden* motion so I have an attorney who's available. And he's telling me I won't have a motion unless I take the stand. He does not want to subpoena the contents of my safe which includes, but not limited to, my rental agreement. Almost two years' worth of records. He can check the book with my name and addresses. This is his attempt to get me to the stand, and that's not going to happen.

"The Court: Okay. All right. [¶][Y]ou understand that I've advised you of the things which I-you know, I need to advise you of.

"[Petitioner]: Can we confirm for trial having impeached the witness?

"The Court: I'm sorry. Right now we're dealing with whether or not I'm going to relieve Mr. Rivera and allow you to represent yourself. Okay. Now, I would advise you against self-representation. It's a bad idea.

"[Petitioner]: Right.

"The Court: If I were arrested and charged with a criminal offense, the first thing I would do, before calling a bondsman, would be to call a lawyer. [¶] ... [¶] ... Too often when you're that close to a situation, you're not able to objectively and rationally handle it and deal with whatever it is that you have to deal with in a case-okay-during the trial, pretrial hearings, et cetera.

"[Petitioner]: I thought the same way, Your Honor. Every attorney I've had has taken the role to serve the prosecutor, and there's not-

"The Court: I've know Mr. Rivera for how many-20 years, at least. That would be the least of my concerns regarding Mr. Rivera, is that he's in the hip pocket of the D.A., and I actually prosecuted cases where he would handle the other side, you know. [Petitioner], please.

"[Petitioner]: I apologize.

"The Court: This has nothing to do with Mr. Rivera. This has to do with your understanding what all is involved in self-representation. With all that in mind, you want to represent yourself?

"[Petitioner]: Yes, I do.

"The Court: All right. Mr. Rivera, I'm going to relieve you at this time. We'll grant [Petitioner] pro per status."

After the trial court granted [Petitioner] in pro per status and informed him that his trial date was November 13, [Petitioner] asked that it be postponed until the end of the

13

month. The prosecutor objected, due to a scheduling conflict. The court refused to continue the trial, but rescheduled the readiness hearing to November 9, at [Petitioner]'s request. At the subsequent readiness hearing before Judge Turner, [Petitioner] rejected the People's offer of 17 years, and the November 13, 2006, trial date was confirmed.

On November 13, 2006, Judge Michael G. Bush was set to hear [Petitioner]'s motions to suppress evidence and to quash and traverse the search warrant before proceeding with the trial. Before evidence was presented on the motions, [Petitioner] asked if the trial court could appoint someone as "co-counsel" to "make things a little smoother." The court refused. [Petitioner] acknowledged that he had been warned he would need to present his own evidence.

After the prosecutor presented evidence on the suppression motion, the court asked [Petitioner] if he had any witnesses to call. [Petitioner] explained that he did, but did not have them under subpoena. The court asked [Petitioner] if he was ready to go to trial, despite not having witnesses subpoenaed, and he said that he was.

[Petitioner] then explained that he was representing himself because it was the only way he "would be able to get a trial," and he again asked for "an attorney to help me." The court again refused. The following exchanged occurred:

"The Court: Here is what you have to decide. Are you ready to go to trial or do you want your attorney back or are you making a motion to continue?

"[Petitioner]: Would it be possible if I made that decision tomorrow because when I go back to the jail tonight, I can get on the phone, make a couple phone calls, and try to locate a few witnesses.

"The Court: I'm moving forward in trial. I haven't heard any motions. I'm not going to bring it up. I'm just telling you that I'm moving forward because it was sent to me as a trial. I'm under the impression that you told Judge Felice, who is the presiding judge, who is the master calendar where he sends the trials out, that you were ready even though you had only been representing yourself a couple weeks. So I'm doing the trial.

"[Petitioner]: Right. I understand."

The following day, November 14, 2006, [Petitioner] asked to be represented by counsel or, if that was not possible, to be granted a continuance "to get those phone records and additional witnesses." The court denied both requests:

"The Court: [W]hen you decided to represent yourself, you apparently told Judge Felice you were ready to go to trial today. He may not have relieved Mr. Rivera if he thought you would simply be asking for a continuance and if he thought you wouldn't be ready, because the case is old. It's not only old for you, it's old for the other side, too. [¶] ... [¶] So it's time to go to trial on this, and you have made some decisions that you have to live by. As I said, I'm not prepared to appoint an advisory counsel at this late date or a co-counsel by any means unless you can show me some research or some case you want me to study that would allow me to stop the trial and re-appoint an attorney for you now that I've let you make your decision. If we weren't in trial, I might look at it differently, but we are in trial. The People have witnesses lined up. It's not fair to them either."

After hearing testimony from two witnesses and taking a brief recess, the court revisited [Petitioner]'s request for a continuance. The prosecutor objected, stating that the

14

witnesses were all present, including two from out of state, and that the case had already been continued "probably about 10 times." The prosecutor noted that the case had been pending for two years and that it had been [Petitioner] who wanted to go to trial without delay. The court attempted to clarify whether [Petitioner] was asking for a continuance or whether he wanted to have an attorney appointed to represent him. The court explained that, if [Petitioner] wanted an attorney, there would most likely be a two- to three-month continuance, to which [Petitioner] stated, "I would like an attorney as long as he is willing to do something...." The court then called a recess and asked the prosecutor to research "at what stage of the proceedings can a pro per defendant say I want my attorney back."

Following the recess, the prosecutor presented one case, *People v. Gallego* (1990) 52 Cal.3d 115, which she said listed the various factors to consider. The prosecutor objected again to a continuance because of the witnesses that were present and the fact that [Petitioner] had already gone through eight attorneys. She disputed [Petitioner]'s claims that the investigator had not met with [Petitioner] and that [Petitioner]'s last attorney had not worked diligently on the case. [Petitioner] explained that he had been frustrated with the lack of progress in his case and that he had made an "irrational decision" to represent himself.

The court then looked through [Petitioner]'s file and denied [Petitioner]'s request for the following reasons:

"[The Court:] I've looked through the dockets in the court file. I find the following: That the public defender was first appointed to represent [[Petitioner]]. There is a Marsden hearing in '05, and the public defender was relieved and Mr. Gardina was appointed. Mr. Gardina actually conducted the preliminary hearing. He was on the case for quite a while. He filed a motion in which he indicated there was a conflict and had to be relieved.

"Now, I also have personal knowledge that Mr. Gardina was appointed around that same time to a death penalty case and was trying to be relieved of all his cases to concentrate solely on the death penalty case. That may be-that may have been the reason why he actually conflicted out, but it's not in the written paperwork. But I'm aware of that since the death penalty case is in front of me. So I don't know that-it's out there. It's something to consider. Mr. Butkiewicz was then appointed. He conflicted out in September of '05. Mr. Soria was then appointed. He conflicted out in January of '05 [*sic* ]. Ms. Mueller was then appointed, and then she conflicted out. Mr. Moffat, I don't remember if he was appointed or retained. I think he was appointed-

"[Prosecutor]: He was appointed, your Honor.

"The Court:-because there was a Marsden. If he was retained, there wouldn't be a Marsden. There was a Marsden that he conceded, according to the docket. I don't know what that means, but it says he basically conceded that. That was in July of '06. Mr. Lampkin had it. He was appointed. He conflicted out. Then Mr. Rivera had it. Mr. Rivera filed a motion to continue the case. It was filed on October 26, to be heard on 10-31. In that motion, he indicated in a declaration everything that he had done, the amount of discovery that was available to him, and what he needed to do.

"On October 31st, that apparently-that motion was heard in front of Judge Felice. [Petitioner] was present. In fact, the docket even indicates that the reason for the continuance was that Mr. Rivera had just received 450 pages of discovery. The next line on that docket states [Petitioner] does not want to waive time. He wants

the case to go to trial. So clearly he knew the reason that Mr. Rivera wanted a continuance and needed a continuance. And then [Petitioner], in lieu of waiving time, requested to represent himself.

"He was advised of the perils and pitfalls of self-representation, and he chose to go pro per, and that's what brings us here today. And then based on that, the People have flown a witness out from Virginia and have apparently lined up witnesses, if I find that they can testify, from as far away as Las Vegas, which is a five-hour drive. I don't know if they are doing [*sic*] to fly or drive. And Ridgecrest, which is in our county, but it's still two hours away.

"The Court is mindful of some of the factors that should be considered, which is a track record of substitution of counsel. It's hard to say exactly what these conflicts were, but in all the years that I've been involved in the criminal law, I think most judges, most attorneys would say this is a lot of conflicts. Even though this is a very serious case, this is a lot of conflicts. Even if we don't consider Mr. Gardina's situation, there is still four conflicts and two Marsdens. That's a lot. [Petitioner] does seem to be going through attorneys.

"I don't know, quite honestly, when ... if I grant [Petitioner]'s motion and give you another attorney, sir, I think you are just to end up conflicting out or having a Marsden. I don't think you are going to work with your attorney.

"[Petitioner]: Your Honor-

"The Court: Hold it. It's my turn. The reasons for the request, the reasons that you stated you knew-when you answered up ready for trial yesterday and you really knew it on October 31st when Mr. Rivera filed a motion and even if you didn't read that motion, apparently [the prosecutor] or [Petitioner]-... assume verbally he told the judge what the reason for the continuance was because the docket says there is 450 pages of new discovery. So that was something that the attorney knew or-excuse me-[Petitioner] knew yet he still requested to go pro per.

"The length and stage of the proceedings, this case is way too old to continue it again. The case needs to get to trial one way or the other. It's not fair to [Petitioner], it's not fair to the victim. This case is old, it needs to go to trial. We are in the trial court. The disruption likely to ensue, it interrupts everybody's life once again. I don't know that I could-there is any facts to state that it's anything-any more of a disruption than any other continuance, but it is certainly disruptive and [Petitioner]'s likely effectiveness without counsel.

"In the motions we had, even though the motions were decided against you, you actually-there was a couple areas where you cross-examined or attempted to cross-examine the witness, ... and you pointed some things out that actually I thought were pretty good for a layman. I think you can be effective in your representation as best as someone who is not a lawyer can be. You are certainly not incompetent by any means. You certainly don't have any mental defects or mental deficiency that I've seen that would prevent you from participating.

"Anyway, so I've considered all those things. I've considered that-I don't know and I know [your investigator] is here and he is helping you, but he is stuck between a rock and a hard spot. I appreciate that. But he's done the best he can given the limited amount of time.

"[Petitioner], you have put yourself in this situation. You have put the People and

all these witnesses they have lined up, the Court's ready to go. I think that we will accomplish nothing but continuing this case over and over if we don't get it to trial when I look at all these factors. So I'm going to deny your request-

"[Petitioner]: Excuse me, your Honor.

"The Court: Let me finish. I'm going to deny your request to revoke your pro per status and continue the case.

"Also wanted to note that although we talked a little bit earlier about whether or not Mr. Rivera would be available, and apparently he is not, I've not considered that. After I've done some research, I think it's inappropriate for me to consider whether or not an attorney is ready to step in right now. So I'm not considering that. If these other factors that I reviewed would have called for a continuance, I would have done it-or called for a reappointment of an attorney, I would have done it. I'm not considering the fact that someone may or may not be ready to step in.

"I also wanted to make a further record on [Petitioner]'s request for either-it doesn't matter how you term it, if it's co-counsel. That is, I think, a different situation-but second counsel or advisory counsel or standby counsel. I don't think I made it clear earlier, and I should have made it more clear.

"I understand that [Petitioner]'s asking for advisory counsel to help him ask questions. I think his questions overall were-although I had to help him on a couple occasions, and I don't mean to help him, but help direct him to answer them in a legally correct manner, I know I have the discretion to appoint such a counsel. But given the fact that the Court has appointed-again, we will take Mr. Gardina out of the equation because he had a good reason to get off the case-seven different attorneys, I'm going to use my discretion. I'm going to weigh that against where we are, and I'm not going to appoint an advisory counsel in this even though I have considered that and I'm not-I've considered it. I've thought about this a lot over lunch, to be honest with you, because I want to make sure I do the right thing. But I've considered where we are and what this case has gone through and what [Petitioner] has requested, and I'm not going to appoint an advisory counsel. I think it would just delay the proceedings, and I don't know that it would be fair to that advisory counsel either. But the bottom line is that I don't think it's appropriate in this case even though I know I have discretion to do so."

Following its denial of a continuance, the court considered the People's in limine motions. During the hearing on the motions, [Petitioner] stated he did not understand the proceedings, that he could not go forward, and he refused to answer the court's questions. When [Petitioner] again said he did not understand what was going on and that he had no choice but to represent himself, the trial court stated it had observed [Petitioner] and had noted that his attitude had changed since his request had been denied.

Thereafter, [Petitioner] represented himself through various motions in limine filed by his former attorney and during jury selection. He objected to various photographs the prosecution sought to admit and he asked for copies of several for his own defense. After the court gave opening instructions and both parties made opening statements, the prosecution began its case and called 13 witnesses: the firefighter, paramedic, police officers, physician and nurse involved in the case; the victim; the persons Ruth ran to for shelter; a Battered Women's Syndrome expert; a sexual assault victim advocate; and a physician who treated one of [Petitioner]'s ex-girlfriends following an injury.

While Officer James was on the stand, one of [Petitioner]'s former attorneys, Douglas Moffat, indicated that he had been hired by [Petitioner]'s mother the previous night to represent [Petitioner]. After consideration, the trial court allowed Moffat to take over as defense counsel. Officer James then completed his testimony and six additional prosecution witnesses testified, consisting of two crime lab technicians, a police sergeant, [Petitioner]'s ex-girlfriends Ms. C. and Ms. L., and Ms. C.'s mother. Moffat called 10 witnesses for the defense, two of whom had previously testified for the prosecution before Moffat took over, including the victim, Ruth.

### *Applicable Authority and Analysis*

In *Faretta, supra,* 422 U.S. 806, the court held that the right to assistance of counsel, guaranteed by the Sixth and Fourteenth Amendments, includes the right of an accused to elect self-representation.

In *People v. Lawley* (2002) 27 Cal.4th 102, the court held a trial court must consider the totality of the circumstances when ruling on a defendant's motion to relinquish in pro per status after commencement of trial. (*Id.* at p. 149; *People v. Gallego, supra,* 52 Cal.3d at p. 164.)

In exercising its discretion, the trial court should consider the factors described in *People v. Windham* (1977) 19 Cal.3d 121, which also are applicable when a defendant seeks to invoke the right to self-representation in the middle of trial:

"'Relevant factors should include, among others, the following: (1) defendant's prior history in the substitution of counsel and the desire to change from self-representation to counsel-representation, (2) the reasons set forth for the request, (3) the length and stage of the trial proceedings, (4) disruption or delay which reasonably might be expected to ensue from the granting of such motion, and (5) the likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney....'" (*People v. Gallego, supra,* 52 Cal.3d at p. 164, quoting *People v. Elliott* (1977) 70 Cal.App.3d 984, 993-994; see *People v. Lawley, supra,* 27 Cal.4th at p. 149; *People v. Windham, supra,* 19 Cal.3d at p. 128.)

A court may also consider the defendant's motive in asking to withdraw a *Faretta* waiver. (*People v. Ngaue* (1991) 229 Cal.App.3d 1115, 1126; *People v. Trujillo* (1984) 154 Cal.App.3d 1077, 1087.)

But "'[w]hile the consideration of these criteria is obviously relevant and helpful to a trial court in resolving the issue, they are not absolutes, and in the final analysis it is the totality of the facts and circumstances which the trial court must consider in exercising its discretion as to whether or not to permit a defendant to again change his mind regarding representation in midtrial.'" (*People v. Gallego, supra,* 52 Cal.3d at p. 164.)

Here, [Petitioner] contends that the trial court abused its discretion when it considered the applicable factors. We address each factor in turn.

### *1. History Regarding Substitution of Counsel*

[Petitioner] claims the court erred when it based its decision heavily on the first factor, his prior history of substitution of counsel. As argued by [Petitioner], he was "improperly penalize[d] ... for exercising his constitutional right to effective assistance of counsel and because [the denial wa]s based on the unsupported assumption that

[Petitioner] caused his attorneys to declare a conflict of interest." According to [Petitioner], both of his *Marsden* motions were granted because the attorneys were constitutionally ineffective, and there is no evidence that [Petitioner] was responsible for the fact that five of his attorneys declared conflicts.

The record shows that [Petitioner] made a total of four *Marsden* motions, three against Moffat, the attorney who took over [Petitioner]'s representation midtrial. After the first two motions against Moffat were denied, Moffat conceded on the third. The record on the July 3, 2006, *Marsden* motion shows that Moffat conceded the motion because there had been a complete breakdown of communication in his relationship with [Petitioner].

The record does not reveal the reasons for the various conflicts of interest that were declared. The trial court acknowledged that, except as to attorney Gardina, who had a death penalty trial, it did not know the reasons for the conflicts. What the court did know, however, was that [Petitioner]'s case was dragging. For whatever the reasons, [Petitioner] had been through eight attorneys. His case had been delayed and continued repeatedly as a result. [Petitioner] himself had expressed impatience with the delays. He thought or at least said he thought that all of his eight attorneys had "taken the role to serve the prosecutor." We conclude from all of this that the trial court was correct in considering the first factor as weighing against the appointment of yet another attorney.

### *2. Reasons for Seeking Reappointment of Counsel*

[Petitioner] contends the court ignored the second factor: the reasons set forth for the request. According to [Petitioner], his reasons were valid because he repeatedly informed the trial court that he was ignorant of the law and he made an "irrational decision" when he elected to represent himself.

[Petitioner]'s argument is unpersuasive. At the time he asked to represent himself, he was repeatedly warned that, if he did so, he would be held to the same standard as an attorney, including adherence to the rules of evidence and procedure. He would be in no better position than his attorney with reference to trial readiness. Nevertheless, he had "weighed out all the pros and cons" and he "want[ed] to get on with it."

[Petitioner]'s request for counsel or, in the alternative, a continuance to allow him to obtain phone records and to subpoena witnesses, came during the trial court's consideration of a suppression motion. [Petitioner] had, the previous day, again assured the trial court he was ready to go to trial. When [Petitioner] made his request, the trial court questioned whether [Petitioner] was asking for reappointment of counsel or for a continuance. [Petitioner] vacillated: "I would like an attorney as long as he is willing to do something." We conclude that the trial court acted within its discretion in considering the reason for [Petitioner]'s request as a factor weighing against granting it.

### *3. Length and Stage of Proceedings*

[Petitioner] contends that the court's analysis of the third factor-the length and stage of the trial proceedings-was erroneous because the court referred to the overall length of time it took to get [Petitioner]'s case to trial, not the stage of trial in which he sought to reassert his right to counsel. The court reasoned,

"The length and stage of the proceedings, this case is way too old to continue it again. The case needs to get to trial one way or the other. It's not fair to [Petitioner], it's not fair to the victim ."

[Petitioner] argues that his request for reappointment of counsel should have been granted because it was made the day before the jury was selected and two days before any witnesses testified. He relies on three cases in which the appellate courts have found error in the denial of requests for the reappointment of counsel made at or around the time of jury selection and before any evidence has been introduced. (*People v. Hill* (1983) 148 Cal.App.3d 744 (*Hill* ) [denial of request for reappointment of counsel before jury selection held to be abuse of discretion]; *People v. Cruz* (1978) 83 Cal.App.3d 308 (*Cruz*) [denial of request on date originally set for trial held to be abuse of discretion]; *People v. Elliott, supra,* 70 Cal.App.3d 984 [denial of request made immediately after jury selection held to be abuse of discretion].) In each of those cases, the court noted that granting the request would not have required a lengthy continuance or prejudiced the prosecution. Denial of the motion on the mere basis that a continuance would be necessary was improper. (*Hill, supra,* at p. 761; *Cruz, supra,* at pp. 320-321; *People v. Elliott, supra,* at pp. 996-998.) Here, as already described *ante,* there was more than simply the need for a continuance to justify [Petitioner]'s request. There was an old and difficult case, which had been continued over and over. And there were reasons to think, as did the trial court, that reappointment of counsel would "accomplish nothing but continu[e] this case over and over [again]."

### *4. Likely Disruption or Delay*

[Petitioner] contends that the court's finding on the fourth factor-the disruption or delay that might reasonably be expected to ensue from granting the motion-fell short of the type of finding that would warrant denying him his right to counsel. In addressing this factor, the court expressed concern that the delay would interrupt "everybody's life once again," referring to the many witnesses who had to be again found and subpoenaed, and that witnesses were already present from out of state.

We agree with the trial court. Obviously, it would take some amount of time for new counsel to be appointed and to review the case file. Pretrial matters already addressed might have to be revisited. It is beyond dispute that delays immediately before trial carry a significant threat of disruption for both the court and the witnesses. (*People v. Ngaue, supra,* 229 Cal.App.3d at p. 1123.)

[Petitioner] claims that respondent's complaint that reappointment of counsel would require a continuance "rings hollow," because the prosecutor had not objected when attorney Rivera moved to continue trial, or on other occasions when defense counsel requested more time. But as respondent notes, the People made preparations for trial based on [Petitioner]'s repeated insistence that he wished to proceed as scheduled. He wanted to "get on with it."

### *5. [Petitioner]'s Effectiveness in Representing Himself*

Finally, [Petitioner] claims that the trial court "applied an unduly low standard" when it found the fifth factor, the likelihood of [Petitioner] effectively defending himself against the charges if he continued to represent himself, weighed in favor of denying [Petitioner]'s motion. The court explained that, during the hearing on various motions, it found that [Petitioner] had competently cross-examined a witness. The court said:

"[Y]ou pointed some things out that actually I thought were pretty good for a layman. I think you can be effective in your representation as best as someone who is not a lawyer can be. You are certainly not incompetent by any means. You certainly don't have any mental defects or mental deficiency that I've seen that would prevent you from participating."

[Petitioner] points out that the court was aware he had no prior experience in self-representation. But [Petitioner]'s inexperience did not compel the court to grant his motion for reappointment of counsel; [Petitioner] cites no case that holds otherwise.

Based on the record before us, we conclude that the trial court did not abuse its discretion in denying [Petitioner]'s request to be relieved of his decision to represent himself.

### *Prejudice Analysis*

Assuming that the trial court did err when it denied [Petitioner]'s request for reappointment of counsel, we proceed to consider the question of prejudice. [Petitioner] argues that the erroneous denial of his request to withdraw his *Faretta* waiver (1) requires automatic reversal, citing the Sixth Amendment and *People v. Lawrence* (2008) 158 Cal.App.4th 685, review granted April 9, 2008, or, (2) in the alternative, was prejudicial under both *Chapman v. California* (1967) 386 U.S. 18 and *People v. Watson* (1956) 46 Cal.2d 818, 836.

While some constitutional errors that necessarily render a trial fundamentally unfair-like the complete denial of the right to counsel or adjudication by a biased judge-require reversal without regard to the evidence in the particular case, "there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." (*Rose v. Clark* (1986) 478 U.S. 570, 577, 579, disapproved on another ground in *Yates v. Evatt* (1991) 500 U.S. 391, 402-403, fn. 8, in turn overruled on other grounds in *Estelle v. McGuire* (1991) 502 U.S. 62, 73, fn. 4.) "'The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, [citation], and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.' [Citations.]" (*Rose v. Clark, supra,* at p. 577.)

In this case, it was not the court that deprived [Petitioner] of the assistance of counsel but his own considered decision to exercise his *Faretta* waiver to represent himself. In that circumstance, several Courts of Appeal, including this court, have employed a harmless error analysis in determining prejudice. (*People v. Ngaue, supra,* 229 Cal.App.3d at p. 1126; *People v. Sampson* (1987) 191 Cal.App.3d 1409, 1418; *Hill, supra,* 148 Cal.App.3d at p. 762; *People v. Elliott, supra,* 70 Cal.App.3d at p. 998.) As explained by the court in *Elliott,* "[s]ince defendant has exercised his constitutional right of self-representation, an abuse-of-discretion error in not permitting defendant to change his mind does not appear to us to be of constitutional dimension." (*Id.* at p. 998.)

The weight of authority suggests that *Watson* states the correct standard of review, i.e., whether it is reasonably probable that a different result would have occurred absent the error. (*People v. Sampson, supra,* 191 Cal.App.3d at p. 1418; *People v. Elliott, supra,* 70 Cal.App.3d at p. 998; *Hill, supra,* 148 Cal.App.3d at p. 762.) But we acknowledge that other authority suggests we should consider whether the error in denying [Petitioner]'s request for the reappointment of counsel was harmless beyond a reasonable doubt pursuant to *Chapman.* (See *People v. Carroll* (1983) 140 Cal.App.3d 135, 144.)

Here, even using the *Chapman* standard, the effect of the error on [Petitioner]'s convictions was harmless beyond a reasonable doubt. [Petitioner] admitted that he beat Ruth and that the beating was severe. Ruth's testimony of the events that occurred were borne out by her testimony, her injuries, and evidence recovered from the apartment. Testimony by [Petitioner]'s ex-girlfriends of domestic violence lent additional credence to Ruth's testimony. In addition, [Petitioner]'s defense counsel was able to recall several

1
2
3

prosecution witnesses, as well as represent [Petitioner] during the entire defense of his case. Furthermore, the jury acquitted [Petitioner] of attempted murder and dissuading a witness. Given these factors, we conclude beyond a reasonable doubt that, even had the trial court granted [Petitioner]'s request to reappoint counsel, [Petitioner] would have achieved no better result.

4   (See Resp't's Answer Ex. A.)

5         In this case, Respondent correctly argues that federal habeas relief is unavailable because

6   the state court decision was not contrary to, or an unreasonable application of, clearly established

7   Supreme Court precedent, 28 U.S.C. § 2254(d)(1), as there is no Supreme Court authority

8   requiring reappointment of counsel at Petitioner's request once he has waived his right to

9   counsel.

10        "The Sixth and Fourteenth Amendments of our Constitution guarantee that a person

11  brought to trial in any state or federal court must be afforded the right to the assistance of counsel

12  before he can be validly convicted and punished by imprisonment." Faretta v. California, 422

13  U.S. 806, 807 (1975).  The Sixth Amendment also implies a right of self-representation. Id. at

14  821.  Supreme Court precedents "place beyond doubt that the Sixth Amendment right to counsel

15  may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and

16  intelligent." Montejo v. Louisiana, __ U.S. __, __, 129 S.Ct. 2079, 2085 (2009), citing, Patterson

17  v. Illinois, 487 U.S. 285, 292 (1988), Brewer v. Williams, 430 U.S. 387, 404 (1977), Johnson v.

18  Zerbst, 304 U.S. 458, 464 (1938).  A defendant may waive the right whether he is already

19  represented or not, and he need not be counseled before waiving the right. Michigan v. Harvey,

20  494 U.S. 344, 352-53 (1990).  "It is undeniable that in most criminal prosecutions defendants

21  could better defend with counsel's guidance than by their own unskilled efforts," Faretta, 422

22  U.S. at 834, "[a]nd although [a defendant] may conduct his own defense ultimately to his own

23  detriment, his choice must be honored out of 'that respect for the individual which is the

24  lifeblood of the law.'" Id., quoting, Illinois v. Allen, 397 U.S. 337, 350-51 (1970) (Brennan, J.,

25  concurring).  In this case, it is undisputed that Petitioner made a voluntary, knowing and

26  intelligent decision to waive his right to counsel.  A valid waiver having been executed, the

27  question before the Court is whether Supreme Court precedent requires reappointment midway

28  through trial should the defendant request withdrawal of his waiver.

The parties have not cited, and the Court is unaware of, any authority "squarely" confronting the "specific legal rule" in question. Knowles, 129 S.Ct. at 1419.  In Johnson v. Zerbst, *supra*, 304 U.S. at 467-68, the Supreme Court stated that when the right to counsel "is properly waived, the assistance of counsel is no longer a necessary element of the court's jurisdiction to proceed to conviction and sentence."  There is simply no Supreme Court authority holding that reappointment is required upon a defendant's request following a valid waiver. Petitioner cites to Grandison v. Maryland, 479 U.S. 873, 876 (1986), wherein Justice Marshall stated, "Even at midtrial in a non-bifurcated proceeding, a trial court's unexplained refusal to permit a defendant to revoke his assertion of the right to self-representation would surely constitute an abuse of discretion."  However, this was not a Supreme Court holding, but a hypothetical in a dissenting opinion.  In addition, the opinion discusses the trial court's hypothetical decision in the context of an abuse of discretion, not the denial of a fundamental constitutional right.  Williams v. Borg, 139 F.3d 737, 740 (9th Cir.), *cert. denied*, 525 U.S. 937 (1998) (Federal habeas relief is available "only for constitutional violation, not for abuse of discretion"). Moreover, the trial court in this case did not deny Petitioner's request without explanation; rather, the court carefully considered Petitioner's request and offered numerous reasons for the decision.  Petitioner may take issue with the trial court's decision, but he has failed to demonstrate the denial of a constitutional right.

Petitioner also cites to the Ninth Circuit opinion in Menefield v. Borg, 881 F.2d 696 (1989).  In Menefield, the Ninth Circuit held that a defendant who requested an attorney at the time of a motion for new trial was entitled to appointment, absent a showing of bad faith, notwithstanding the fact he had waived his right to counsel and represented himself at trial. Id. Menefield is distinguishable from the case at hand, and regardless, is not relevant to the ultimate question in this case since it is an opinion from a circuit court, not Supreme Court precedent. Menefield concerned the appointment of counsel at a *post-trial* motion.  The Ninth Circuit specifically noted this distinction: "The question in this case, of course, does not involve a midtrial switch but, instead, a change of course in a post-trial proceeding." Id., at 697, fn. 2. Indeed, the Ninth Circuit noted that the very question in this case was left unanswered by the

1    Supreme Court in <u>Faretta</u>:

2        Justice Blackmun, writing for three dissenters, pointed out that *Faretta* left unresolved a
         series of important issues and questioned the federal court's ability to reconcile the
3        procedural dilemmas raised by the self-representation rule. "How soon in the criminal
         proceeding must a defendant decide between proceeding by counsel or pro se? *Must he*
4        *be allowed to switch in midtrial?*" [Citation.]

5    <u>Menefield</u>, 881 F.2d at 697 (italics in original). The Ninth Circuit further noted that "[t]here are

6    times when the criminal justice system would be poorly served by allowing the defendant to

7    reverse his course at the last minute and insist upon representation by counsel." <u>Id</u>. at 700, *citing*,

8    <u>United States v. Studley</u>, 783 F.2d 934, 938 (9th Cir.1986), <u>United States v. Leavitt</u>, 608 F.2d

9    1290, 1293 (9th Cir.1979).  Accordingly, Petitioner fails to demonstrate the existence of Supreme

10   Court authority which would require reappointment of counsel following a valid waiver.

11       Petitioner contends Supreme Court authority exists in the well-established legal principle

12   that a defendant is entitled to counsel at all "critical stages" of trial, <u>Montejo</u>, *supra*, 129 S.Ct. at

13   2085, and that by denying counsel midway through trial, the trial court denied Petitioner his right

14   to counsel at a critical stage.  Petitioner's argument is not well-taken.  Petitioner is correct that

15   there is no ambiguity that he has a right to counsel at all critical stages of criminal proceedings;

16   however, Petitioner himself offered a knowing, voluntary and intelligent waiver of that right.  He

17   cannot now complain that he was denied that right when it was he who opted to forego that right

18   and instead invoke his constitutional right of self-representation.

19       As Petitioner fails to demonstrate that the state court's decision was "contrary to, or

20   involved an unreasonable application of, clearly established Federal law," or an "unreasonable

21   determination of the facts in light of the evidence," the claim should be rejected.  28 U.S.C. §

22   2254(d).

23                                    **RECOMMENDATION**

24       Accordingly, the Court HEREBY RECOMMENDS that this action be DENIED WITH

25   PREJUDICE.

26       This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii,

27   United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and

28   Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of

California.  Within thirty (30) days after service of the Findings and Recommendation, any party

may file written objections with the court and serve a copy on all parties.  Such a document

should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

to the objections shall be served and filed within fourteen (14) days after service of the

objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C.

§ 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time

may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

Cir. 1991).


   IT IS SO ORDERED.

   **Dated:    March 17, 2011         _____ /s/ Gary S. Austin_____**
                                  UNITED STATES MAGISTRATE JUDGE